UNITED STATES DISTRICT COURT

CENTRAL DISTRICT OF CALIFORNIA

SOUTHERN DIVISION

- - -

THE HONORABLE JAMES V. SELNA, JUDGE PRESIDING

TRENDSETTAH USA, INC., et al,)CERTIFIED TRANSCRIPT
                    Plaintiffs, )
      vs.                       )
                                ) SACV-14-01664-JVS
SWISHER INTERNATIONAL,          )
et al.,                         )
                    Defendant.  )
----------------------------)

REPORTER'S TRANSCRIPT OF PROCEEDINGS

Santa Ana, California

April 17, 2023

SHARON A. SEFFENS, RPR
United States Courthouse
411 West 4th Street, Suite 1-1053
Santa Ana, CA  92701
(612) 804-8655

```
1    APPEARANCES OF COUNSEL:

2    For the Plaintiffs:

3    MARK W. POE
     GAW POE, LLP
4    4 Embarcadero Center, Suite 1400
     San Francisco, CA  94111
5    (415) 766-7451

6    For the Defendant:

7    THEODORE J. BOUTROUS, JR.
     DANIEL G. SWANSON
8    SAMUEL ECKMAN
     GIBSON DUNN & CRUTCHER, LLP
9    333 South Grand Avenue
     Los Angeles, CA  90071-3197
10   (213) 229-7000

11   JULIAN WOLFE KLEINBRODT
     GIBSON DUNN CRUTCHER, LLP
12   555 Mission Street, No. 3000
     San Francisco, CA  94105
13   (415) 393-8382

14

15

16

17

18

19

20

21

22

23

24

25
```

1    SANTA ANA, CALIFORNIA; MONDAY, APRIL 17, 2023; 1:31 P.M.

01:31   2              THE CLERK:  Calling Case No. SACV-14-01664-JVS,

01:31   3    Trendsettah, USA, Inc., et al., versus Swisher

01:31   4    International, Inc.

01:31   5              **Counsel, please state your appearances for the**

01:31   6    **record.**

01:31   7              **MR. POE:  Good afternoon, Your Honor.  Mark Poe**

01:31   8    **for Trendsettah.**

01:31   9              THE COURT:  Good afternoon.

01:31   10             MR. BOUTROUS:  Good afternoon, Your Honor.

01:31   11   Theodore Boutrous for Swisher.

01:31   12             THE COURT:  Good afternoon.

01:31   13             MR. ECKMAN:  Samuel Eckman for Swisher.

01:32   14             THE COURT:  Good afternoon.

01:32   15             MR. KLEINBRODT:  Julian Kleinbrodt for Swisher.

01:32   16             THE COURT:  Good afternoon.

01:32   17             MR. SWANSON:  Daniel Swanson for Swisher, Your

01:32   18   Honor.

01:32   19             THE COURT:  Very good.

01:32   20             The Court proposes to put off some determination,

01:32   21   so why don't I get your thoughts on that first.

01:32   22             **MR. POE:  Well, we have this briefing schedule set**

01:32   23   **out for our Motion for Attorney Fees, Motion for Prejudgment**

01:32   24   **Interest, and if we need to bring it -- it's a little**

01:32   25   **unclear -- a Motion to Vacate the Court's prior fees order**

01:33  1    in favor of Swisher now that the contract judgment has been

01:33  2    reversed.

01:33  3          I think the schedule was that we would file those

01:33  4    two weeks after an order is entered on the sanctions motion,

01:33  5    and I don't see any reason why for our part we couldn't.

01:33  6          I don't know if Your Honor wants to get into the

01:33  7    offset motion.

01:33  8          THE COURT:  I think we have to know the offset

01:33  9    potentially before we get there.

01:33  10         MR. POE:  In a sense.  My view was that the

01:33  11   arguments could be made about if a particular amount is

01:33  12   awarded in sanctions then an offset would be appropriate or

01:33  13   inappropriate.  I think that was the premise on which they

01:33  14   brought their motion and on which we opposed it.  The

01:33  15   trouble that I have with postponing that to allow them to

01:33  16   make a second motion on the same issues is that --

01:33  17         THE COURT:  I think the briefing is probably

01:34  18   adequate.  I just think we need hard numbers.

01:34  19         MR. POE:  That would have been my complaint if

01:34  20   they got a chance to bring a new motion after seeing our

01:34  21   arguments that we make in our opposition.  If in general we

01:34  22   stick with that briefing -- I suppose when we have numbers,

01:34  23   maybe there wouldn't be a need for any argument at all at

01:34  24   that point.  I think Your Honor is proposing if I am

01:34  25   remembering right Swisher would submit its attorney fees in

SHARON A. SEFFENS, U.S. DISTRICT COURT REPORTER

01:34   1   line with Your Honor's order, and I'm just forgetting.  Was

01:34   2   it 30 days from the entry?

01:34   3            THE COURT:  I think so.

01:34   4            MR. SWANSON:  Yes.

01:34   5            MR. POE:  That was one point that I wanted to

01:34   6   raise.  We would just like -- and I expect Your Honor has

01:34   7   contemplated -- the opportunity to object to a number of

01:34   8   categories of those fees once we see what they are.

01:34   9            THE COURT:  Sure.

01:34   10           MR. POE:  I don't know that it would have to be a

01:34   11  full motion, but we would just send in some objections and

01:35   12  wait for the ruling.

01:35   13           THE COURT:  Maybe the best thing is to go straight

01:35   14  to the sanctions motion and see what is left.

01:35   15           Mr. Boutrous.

01:35   16           MR. BOUTROUS:  Thank you very much, Your Honor.

01:35   17  May it please the Court, Theodore Boutrous for Swisher.

01:35   18           This Court's tentative is absolutely right in

01:35   19  finding that TSI engaged in sanctionable bad faith

01:35   20  misconduct through its founder and CEO, Mr. Alrahib, so we

01:35   21  concur obviously in that finding.

01:35   22           I would just like to make the argument and explain

01:35   23  why we believe that the sanctions should go back farther to

01:35   24  the beginning of the case and then, alternatively, if not

01:35   25  all the way to the beginning, at least for the trial.

01:35 1          Here, I don't think there is any question based on
01:35 2    this Court's Rule 60 order, the Ninth Circuit decision, and
01:35 3    the record before the Court that the bad-faith misconduct in
01:36 4    this case began at the inception of the case.
01:36 5          The places in the tentative that I just wanted to
01:36 6    start by focusing on is page 6 under heading 1.  The
01:36 7    tentative states that:  "TSI had valid claims; and,
01:36 8    therefore, the Court declined to find that Trendsettach
01:36 9    initiated the lawsuit in bad faith in October 2014."
01:36 10          We respectfully submit that the Court should
01:36 11   modify that because in the Complaint, Day 1, 2014, they made
01:36 12   the exact frivolous -- I won't even call it frivolous -- the
01:36 13   bad-faith argument that they had been injured because this
01:36 14   is -- as an example, in paragraph 7 of the Complaint -- this
01:36 15   is their fundamental thesis in the Complaint.  While
01:36 16   Mr. Alrahib was engaged in this federal tax evasion scheme,
01:36 17   they filed this Complaint saying Swisher restricted the
01:37 18   supply of low-cost, high-quality cigarillos to the American
01:37 19   consumer.  Swisher's actions to inhibit the growth of its
01:37 20   competitor TSI caused TSI to suffer millions of dollars in
01:37 21   profits from the time those efforts began to the present."
01:37 22          They make the same argument on the breach of
01:37 23   contract claim.
01:37 24          So we know now that it was bad faith to claim that
01:37 25   these were low-cost products, because the only reason they

01:37  1   were low cost was because of the tax evasion scheme.

01:37  2   Mr. Alrahib knew that.  TSI knew that via him when they

01:37  3   filed this Complaint, so on Day 1, the bad faith started.

01:37  4   We also know that he knew and TSI knew there were no lost

01:37  5   profits because all the profits were the product of the

01:37  6   bad-faith scheme.

01:37  7          The Court also on page 6 of the tentative -- the

01:37  8   tentative says:  "The Court made no findings that impacted

01:37  9   liability in connection with the Rule 60 ruling."  But we

01:38  10  respectfully submit, Your Honor, that the thrust of this

01:38  11  Court's findings on the Rule 60 motion in the Ninth Circuit

01:38  12  demonstrate that the bad faith did affect the liability.

01:38  13         For example, the question of whether there was

01:38  14  competitive harm, antitrust injury, went right to this lost

01:38  15  profits issue.  Their theory was -- their entire theory of

01:38  16  the case from Day 1 was that the failure of Swisher to

01:38  17  supposedly provide the cigarillos pursuant to the contract

01:38  18  stopped them for being able to sell their low-cost product

01:38  19  for large profits, and that was the injury that allowed

01:38  20  Swisher to squelch this fledgling upstart company.  That's

01:38  21  not just damages.  That goes to whether there was harm to

01:38  22  competition and antitrust injury, which is an element of

01:38  23  antitrust liability.

01:38  24         In the Ninth Circuit, Your Honor, on page -- I

01:38  25  will find the page.  The Court said -- this is in the Ninth

01:38   1    Circuit's decision:  "Trendsettah does not advance any
01:39   2    contention that the jury would have reached the same verdict
01:39   3    for antitrust liability and damages if it were fully
01:39   4    apprised of Alrahib's fraudulent evasion of federal excise
01:39   5    taxes."
01:39   6            So we do think that the fraud and the bad-faith
01:39   7    conduct that started with the Complaint went to liability,
01:39   8    and it also went to liability in the contract claim.  I will
01:39   9    come back to that.  I know the Court is sensitive to the
01:39   10   contract claim verdict being reinstated, but injury damages
01:39   11   are also an element of breach of contract liability as well.
01:39   12   So we respectfully request the Court modify the tentative in
01:39   13   that respect at paragraph 6.
01:39   14           The other point on the contract claim, the fact
01:39   15   that it's being reinstated doesn't mean it was a valid
01:39   16   claim, because the only reason it's being reinstated was the
01:39   17   time limit as the Court knows under Rule 60.  So the Ninth
01:40   18   Circuit did not find that --
01:40   19           THE COURT:  Well, it seems to me if it's not
01:40   20   timely it doesn't matter how meritorious the arguments are.
01:40   21   It seems to me the Ninth Circuit barely foreclosed going
01:40   22   back and tinkering at all with the contract theory.
01:40   23           MR. BOUTROUS:  We don't disagree with you, Your
01:40   24   Honor.  That was the next point I was going to make.  The
01:40   25   test here is not whether it was a valid claim or whether it

01:40    1    was a frivolous claim.  And the tentative cites the Ninth

01:40    2    Circuit's Fink decision where the Ninth Circuit said that a

01:40    3    finding of bad faith does not require that the legal and

01:40    4    factual basis for the action proved totally frivolous.  That

01:40    5    someone could have a potentially meritorious claim and still

01:40    6    engage in the kind of bad faith, improper purpose conduct

01:40    7    that we have here, this Court has discretion to impose

01:40    8    sanctions to compensate the other party for the costs

01:40    9    incurred as a result of that even if they theoretically had

01:41   10    a claim that they could have pursued in good faith and

01:41   11    honestly.

01:41   12          We gave the Court the two calculations, one where

01:41   13    we excluded $19.6 million where we excluded the

01:41   14    contract-only fees we were able to segregate, but here

01:41   15    because this case -- the driving force -- and this Court

01:41   16    knows the case better than anyone -- was always the

01:41   17    antitrust claims, the treble damages claims, and the theory

01:41   18    that Swisher was stomping out this competitor that had this

01:41   19    great low-cost, high-quality product, that was bad faith.

01:41   20    Those claims were made for an improper purpose throughout

01:41   21    the case.  So we think that the fees and costs should go

01:41   22    back to the beginning of the case, but we are not contesting

01:41   23    at this point excluding that piece that we can easily

01:41   24    segregate.

01:41   25          The other thing is that the Supreme Court has made

01:41  1    clear in the Fox v. Vice case that we cited -- that was in a
01:42  2    fee-shifting case where a party was seeking fees for a
01:42  3    frivolous claim under the law, and there was a non-frivolous
01:42  4    claim.   The Supreme Court in Fox said that a party could
01:42  5    seek fees for work that related to both the frivolous and
01:42  6    the non-frivolous claims.
01:42  7           And this is the quote, and we cite this in our
01:42  8    main brief, Your Honor:  "If an attorney performs work
01:42  9    useful in defending against both the frivolous and
01:42  10   non-frivolous, but did so only because of the defendant's
01:42  11   monetary exposure on the frivolous charge, a Court may
01:42  12   decide to shift fees."  That's fee-shifting, which is
01:42  13   different, which is narrower, because you do have to prove
01:42  14   frivolity of the claim.
01:42  15          Here, thinking about the contract claim and how it
01:42  16   would have played out, as this Court knows, without the lost
01:43  17   profits claim this case would not have been filed.  If we
01:43  18   had all known about the criminal activity, the tax fraud, if
01:43  19   plaintiff's counsel had known, they would not have brought
01:43  20   this case in the first place.  They couldn't have under
01:43  21   Rule 11.  They couldn't have filed that Complaint.
01:43  22          To my mind, that's a classic example of a case
01:43  23   where from its inception, the bad faith, the claims of lost
01:43  24   profits, the tax evasion fraud, was the motivating part of
01:43  25   the case.

01:43    1        If they had honestly disclosed -- let's just put

01:43    2    the antitrust claims aside.  If they had just brought a

01:43    3    breach of contract claim and in the initial disclosure phase

01:43    4    honestly disclosed this tax fraud scheme that took away any

01:43    5    lost profits -- and as the Court notes, they are not even

01:43    6    arguing now they could go forward with a lost profits claim.

01:43    7    They didn't take the Court up on its offer to have a new

01:43    8    trial without the fraudulent conduct.  Their funder, the

01:44    9    sophisticated litigation funder, said if they had known

01:44   10    about the tax fraud they wouldn't have ever funded it.

01:44   11        If we look to the Goodyear case, and it relies on

01:44   12    -- it also cites Fox -- the Court said that this Court has

01:44   13    broad discretion to look at the situation and award fees

01:44   14    based on a sense of the suit, based on its overall sense of

01:44   15    the equities and the fairness of the ultimate compensatory

01:44   16    award.  It has to be grounded in the record.

01:44   17        Here, we believe the Court has ample discretion to

01:44   18    use its good judgment to say there were some fees related to

01:44   19    the contract claim only, but if it had just been the

01:44   20    contract claim, this suit would have been vastly simpler.

01:44   21    There would have been a few witnesses about the breach.

01:44   22    Their contract claim was not based on your traditional

01:45   23    contract damages claim.  It was the same lost profits theory

01:45   24    that was a sham and that was predicated on fraud.

01:45   25        So that's my main request, Your Honor, that the

01:45  1   Court look at it again.  I was going to suggest on our

01:45  2   submission within 30 days if the Court were to modify the

01:45  3   tentative to at least allow us to segregate out expenses

01:45  4   related to the trial itself.  The tentative walks through

01:45  5   the fact that their only theory at trial was this lost

01:45  6   profits claim which was premised on the fraud.

01:45  7            Their expert was given the false information.  He

01:45  8   testified to it.  So I was going to propose -- I don't think

01:45  9   it takes much to modify the tentative.  Then the Court could

01:45  10  if we do the Rule 60 fees, which we concur with the Court --

01:45  11  we should be entitled to that but also to back it up for the

01:45  12  trial fees where this Court, the court staff, Swisher, sat

01:46  13  through and had to litigate this theory of antitrust injury,

01:46  14  antitrust liability, and lost profits that TSI and its CEO

01:46  15  knew were premised on fraud.  We could break that out so the

01:46  16  Court can then decide if the Court is willing to revisit

01:46  17  that question before the final order whether to grant us a

01:46  18  broader array of fees.

01:46  19            THE COURT:  Regardless of how the tentative winds

01:46  20  up, I think it would be helpful to put that information in.

01:46  21            MR. BOUTROUS:  Yes, we can break it down.

01:46  22            THE COURT:  Even if the Court sticks with accrual

01:46  23  at the Rule 60 phase, I think it would be helpful to have it

01:46  24  in the record.

01:46  25            MR. BOUTROUS:  That's what we will do, Your Honor.

01:46   1          I think I have covered the main issues.  I don't

01:46   2   want to repeat all of my arguments.  I may have some

01:46   3   rebuttal issues depending on what my colleagues have to say.

01:46   4          THE COURT:  Okay.  Mr. Poe.

01:47   5          MR. POE:  The rebuttal should be based on what I

01:47   6   have to say.

01:47   7          Swisher certainly did stomp out this low-cost

01:47   8   competitor.  I think Your Honor will remember the history of

01:47   9   the case.  In the first two-and-a-half years of the

01:47   10  relationship, the cigarillos that Trendsettah was selling

01:47   11  were manufactured only by Swisher.  There was no importation

01:47   12  whatsoever.

01:47   13         Your Honor, I think this number will ring a bell.

01:47   14  200 million cigarillos Swisher was obligated to produce

01:47   15  under the requirements contract.  Its own expert and all of

01:47   16  its witnesses admitted that it did not.

01:47   17         So when Mr. Boutrous starts by saying this case

01:47   18  never would have happened without the FET fraud, that didn't

01:47   19  arise until April 2014.  I can forgive Mr. Boutrous for not

01:48   20  knowing the details that well.  He wasn't here.  In fact, no

01:48   21  one at counsel table was here for the trial, but Your Honor

01:48   22  and I were.  We will remember those details.

01:48   23         The water is already over the dam.  When Your

01:48   24  Honor thinks about this, in fact, it was Swisher's

01:48   25  anti-competitive conduct that drove Trendsettah to the

SHARON A. SEFFENS, U.S. DISTRICT COURT REPORTER

01:48   1    Dominican Republic in the first place.  It was under a

01:48   2    requirements contract with Swisher to make as many cigars as

01:48   3    possible and at a low cost --

01:48   4         THE COURT:  That's not a license to engage in tax

01:48   5    fraud along the way.

01:48   6         MR. POE:  No, so we can't say that.  That's not

01:48   7    what I am saying.  What I am saying is that, I mean, very

01:48   8    clearly there was a breach of contract.  There was

01:48   9    anti-competitive conduct over those first two years as the

01:48   10   jury found.  The Ninth Circuit found that the jury was

01:48   11   properly instructed on refusal to deal even if that had been

01:48   12   a theory of the case.  There is no basis to go back to the

01:48   13   start of the case as Swisher is arguing.

01:49   14         To be fair, again, it's probably water over the

01:49   15   dam, but I am troubled by the fact that as we pointed out in

01:49   16   our opposition brief Swisher brought this Motion for

01:49   17   Sanctions on an all or nothing basis.  It did not make the

01:49   18   argument that Your Honor did in the tentative that we should

01:49   19   instead start from some later point, from the Rule 60

01:49   20   proceedings.

01:49   21         It's my belief that as a matter of regular

01:49   22   procedure a litigant, especially one as capably represented

01:49   23   as this one, should be held to the arguments that it put

01:49   24   forward in its motion, and that the Court should refrain

01:49   25   from making different observations that is going to become

01:49  1    the basis for it's going to be $15 million, $18 million, in

01:49  2    sanctions.  Again, if that's water under the bridge, then

01:50  3    that's all I have to say about it.

01:50  4            Lastly, I'm sure Your Honor is not surprised that

01:50  5    we disagree with the tentative for all the reasons that are

01:50  6    in our opposition brief.  That's all I have to say.

01:50  7            THE COURT:  How would the Court apply the

01:50  8    200 million cigarettes vis-a-vis all the costs that were

01:50  9    incurred?  I think what you are telling me is that for some

01:50  10   period of time there was no fraud in fact.

01:50  11           MR. POE:  I mean, there certainly wasn't.  That's

01:50  12   going to go back to undoing these last eight years of

01:50  13   proceedings.  That is not what we are asking for.  Of course

01:50  14   the central point of our opposition is there is no conduct

01:50  15   here that's remotely similar to any bad-faith case.

01:50  16           THE COURT:  Well, just take the case for its own

01:50  17   facts.  Is it your position that running your business on a

01:51  18   basis of the tax fraud and not disclosing it is not bad

01:51  19   faith?

01:51  20           MR. POE:  The bad-faith inquiry concerns only

01:51  21   conduct inside the litigation, not outside the litigation.

01:51  22   So I would say tax fraud -- I suppose there is probably case

01:51  23   law on this.  I'm not sure, so I won't say necessarily --

01:51  24           THE COURT:  Isn't it in the case in that the

01:51  25   expert relied on the numbers that were in play by virtue of

01:51  1   **the tax fraud?  So, yes, the conduct didn't occur during the**
01:51  2   **course of the case itself, although it may have at some**
01:51  3   **later point but not literally in the litigation, but it was**
01:51  4   **certainly engrafted into the litigation by virtue of**
01:51  5   **Trendsettah's damage position and the work of the expert.**
01:51  6              **MR. POE:  We do disagree, Your Honor.  Bad faith**
01:51  7   **requires intent, certainly knowing behavior.  There is zero**
01:52  8   **evidence that Alrahib had any idea how McDuff had calculated**
01:52  9   **damages.  There is no evidence that McDuff had any inkling.**
01:52  10  **He didn't even include excise taxes as a factor in his**
01:52  11  **calculations.  Swisher never suggested that he should.**
01:52  12             Had Swisher said you should calculate and account
01:52  13  for excise taxes in your expert report, and we had gone back
01:52  14  to the drawing board and came forward with the same damages
01:52  15  model, that could be considered bad faith.  But one party
01:52  16  acting completely unknowingly, presenting its case to the
01:52  17  jury completely unknowingly, it's simply -- of course it's
01:52  18  fine if Your Honor disagrees.  It's certainly our view that
01:52  19  where a party unknowingly puts on this evidence about which
01:52  20  the defendant had never inquired, that, no, that's not bad
01:52  21  faith.
01:53  22             **THE COURT:  The Ninth Circuit didn't overturn the**
01:53  23  **60(b) ruling on the basis that they should have known about**
01:53  24  **this fraud.**
01:53  25             **MR. POE:  We had made a diligence argument, and**

| | | |
|---|---|---|
| 01:53 | 1 | the Ninth Circuit did not hold them to the diligence |
| 01:53 | 2 | standard that we think they should have been held to.  I'm |
| 01:53 | 3 | trying to see the significance of that ruling to a bad-faith |
| 01:53 | 4 | inquiry.  I guess I don't see it. |
| 01:53 | 5 | We think about the Goodyear case, maybe the most |
| 01:53 | 6 | significant, pivotal bad-faith case from the Supreme Court |
| 01:53 | 7 | where Goodyear had withheld all these testing results about |
| 01:53 | 8 | tread separation despite them being requested over and |
| 01:53 | 9 | over -- and I want to say but don't hold me to it that there |
| 01:53 | 10 | was a discovery order requiring that be produced and they |
| 01:53 | 11 | had not.  That type of conduct is certainly bad faith. |
| 01:54 | 12 | If we think about Goodyear, I think we would all |
| 01:54 | 13 | agree that had the plaintiff gone along in that case, had |
| 01:54 | 14 | the plaintiff never asked for testing results about tread |
| 01:54 | 15 | separation, and then as it worked out there they settled the |
| 01:54 | 16 | case for some hundreds of thousand of dollars -- had they |
| 01:54 | 17 | later found out about the tread separation and then had they |
| 01:54 | 18 | gone and said that was bad faith for you never to have |
| 01:54 | 19 | informed us of the test results of the tread separation, |
| 01:54 | 20 | that's exactly what we have here, no questions ever asked, |
| 01:54 | 21 | no Court would have held that that was bad faith where the |
| 01:54 | 22 | plaintiff -- the issue is just never injected into the case, |
| 01:54 | 23 | and it was somehow bad faith for Goodyear not to volunteer, |
| 01:54 | 24 | oh, by the way, we have these tests results showing tread |
| 01:55 | 25 | separation.  That wouldn't have happened because that's the |

01:55   1   bad-faith requirement.  It's some kind of intentional

01:55   2   knowing conduct.

01:55   3           THE COURT:  Certainly Mr. Alrahib knew.

01:55   4           MR. POE:  He knew what he was doing, but he didn't

01:55   5   know the significance of that to the damages model that

01:55   6   McDuff had created.  But again, same with Goodyear, somebody

01:55   7   within Goodyear would have known that they had test results

01:55   8   showing tire tread separation, but if they were never asked

01:55   9   about it, a Court is not going to say it was bad faith for

01:55  10   you not to tell the other side about that tire tread

01:55  11   separation.

01:55  12           THE COURT:  On the facts of this case, it seems to

01:55  13   me that Swisher did ask.  They were thrown off the trail.

01:55  14   And having considered that, the Ninth Circuit still found

01:55  15   that the 60(b) motion was timely, namely, that they had been

01:55  16   thrown off the trail.  If they hadn't been thrown off the

01:56  17   trial, the situation of the excise tax would have come out.

01:56  18           MR. POE:  The throwing off the trail as Your Honor

01:56  19   puts it was our objection that producing excise tax would

01:56  20   have been unduly burdensome.  We made the objection.

01:56  21   Mr. Ryan, who I think is here -- I'm sorry, Mr. Roman, who I

01:56  22   think is here, agreed and said we agree not to receive those

01:56  23   records.

01:56  24         So if Your Honor is going to say that the throwing

01:56  25   off the trial was bad faith, then you will need to change

01:56  1    the tentative to say that Mark Poe and Randolph Gaw behaved

01:56  2    in bad faith when they made an objection to a very routine

01:56  3    mundane objection to a discovery request that in fact would

01:56  4    have been unduly burdensome.

01:56  5         THE COURT:  I have consistently said throughout

01:56  6    this litigation that the lawyers did not act in bad faith or

01:56  7    unethically in any way.

01:56  8         MR. POE:  I certainly appreciate that.  I didn't

01:56  9    mean to be saying that that's what you were saying.  I

01:57  10   certainly appreciate that.  That's why that is the basis for

01:57  11   my argument for saying that this thing about throwing off

01:57  12   the trail certainly implicates some knowingness by the party

01:57  13   that is throwing someone off the trial.

01:57  14        I think it would be bad faith to throw someone off

01:57  15   the trail.  Had the plaintiff started asking about test

01:57  16   results and Goodyear had said something kind of innocuous

01:57  17   like "We don't really need to get into testing" when they

01:57  18   knew there were test results that showed tread separation,

01:57  19   that could be considered bad faith.  We just don't have

01:57  20   anything like that here.  Thank you.

01:57  21        THE COURT:  Mr. Boutrous.

01:57  22        MR. BOUTROUS:  Yes, Your Honor.  I think counsel's

01:57  23   argument shows why sanctions must be imposed so litigants

01:57  24   don't engage in this type of bad-faith scheme.  The notion

01:57  25   of comparing this to the Goodyear case is absurd.

01:57  1   Mr. Alrahib knew they were throwing us off the trail.  TSI

01:58  2   through his knowledge knew when they said, oh, it would have

01:58  3   been burdensome to produce those tax records because it

01:58  4   would have shown they were engaged in a massive tax fraud

01:58  5   scheme.

01:58  6          It's not Mr. Poe or Mr. Gaw that we are talking

01:58  7   about.  In those discovery responses, they were acting on

01:58  8   behalf of TSI.  This CEO knew they couldn't even compete.

01:58  9   They wouldn't have had a business.  He basically as the

01:58  10  Court has noted admitted that.

01:58  11         In terms of the discovery, for them to say they

01:58  12  are irrelevant and they are burdensome -- for TSI to say

01:58  13  that, these are responses for TSI.  You don't have to find

01:58  14  any bad conduct by these guys.  But it's outrageous to

01:58  15  suggest that this is like the Goodyear case.  If Goodyear

01:58  16  had been engaged in a massive criminal enterprise and

01:58  17  withheld that and the criminal enterprise was the

01:58  18  underpinning of their case, I believe that would have been a

01:58  19  finding of bad faith.

01:58  20         So in some ways, TSI's position here is that their

01:59  21  conduct is so over the top of bad that the cases don't even

01:59  22  approach it.  They premise the whole case on the low cost

01:59  23  and the lost profits and the inability to sell their

01:59  24  low-cost product that was in play to say, well, the fraud

01:59  25  wasn't part of the case.  That was the underpinning of the

SHARON A. SEFFENS, U.S. DISTRICT COURT REPORTER

01:59    1   case.

01:59    2           THE COURT:  How do you factor in the fact that

01:59    3   with respect to at least some of the sales there were

01:59    4   products made by Swisher and didn't implicate the excise

01:59    5   tax?

01:59    6           MR. BOUTROUS:  Swisher complied with the law and

01:59    7   included the cost.  That was their theory, that because

01:59    8   Swisher's products were more expensive, because they were

01:59    9   paying the excise tax, they were getting injured by not

01:59   10   getting the products that they could sell at a lower cost

02:00   11   where they had their scheme.  So that could have factor into

02:00   12   a damages calculation.

02:00   13          But for these purposes, their entire claim was

02:00   14   premised on the notion that the products were low cost

02:00   15   because they were evading the excise tax.  I think when they

02:00   16   used the other distributor, they were still skimming off,

02:00   17   not paying the taxes, and evading the taxes.

02:00   18          THE COURT:  But how can this be fraud from the

02:00   19   inception if the products they were selling at the time of

02:00   20   the inception were not affected by the tax fraud?

02:00   21          MR. BOUTROUS:  It's not supported by the record,

02:00   22   Your Honor.  The tax fraud scheme began in 2013.  The

02:00   23   Complaint was filed in 2014.  In 2014, they filed their

02:00   24   Complaint in this court saying that it was Swisher that was

02:00   25   causing them not to able to sell these low-cost products.

02:01   1          Our expert showed -- Dr. Fox was unrebutted --
02:01   2   that they would have had negative profitability.  There was
02:01   3   a slight -- in 2013, I think it was less egregious, the
02:01   4   numbers.  So maybe there was a slight period where they
02:01   5   showed some modest little profit, but for sanctions
02:01   6   purposes, by 2014 when they filed the Complaint, Mr. Alrahib
02:01   7   knew that they were engaged in this scheme, and they
02:01   8   couldn't profit.
02:01   9          I think this Court's findings, the Ninth Circuit's
02:01   10  findings -- and I do want to go back.  TSI is trying to
02:01   11  relitigate issues the Ninth Circuit rejected.  The Ninth
02:01   12  Circuit found that they did not even contend that the jury
02:01   13  would have reached the same verdict on antitrust liability
02:01   14  and damages if it were fully apprised of the criminal acts.
02:01   15  So it did go to liability and this notion that TSI didn't
02:02   16  know.  Your Honor made the point Mr. Alrahib knew.
02:02   17         In our reply brief, Your Honor, we cited more
02:02   18  cases.  From the U.S. Supreme Court, the classic New York
02:02   19  Central & Hudson Railroad case from 1909, bedrock law.  TSI
02:02   20  knew everything that Mr. Alrahib knew.  He was the founder,
02:02   21  the CEO.  His credibility was the main focus of the case.
02:02   22         The Supreme Court said:  "Since a corporation acts
02:02   23  by its officers and agents, their purposes, motives, intent,
02:02   24  are just as much those of the corporation as are the things
02:02   25  done."

02:02    1        This wiggling around that TSI was innocent, that's

02:02    2   what calls for sanctions, in part, that future litigants

02:02    3   know that they can't just hide.  That's one of the reasons

02:02    4   we have imputed liability.  Saying, well, we didn't know

02:02    5   that our CEO was engaged in a massive scheme to boost our

02:02    6   profits, to steal money from the government basically, none

02:03    7   of that holds any water.

02:03    8        Regarding the jury's findings, the Ninth Circuit

02:03    9   has rejected what counsel just said, that, well, they showed

02:03   10   anti-competitive conduct.  No, they showed nothing.  The

02:03   11   jury's findings are meaningless with all respect to the jury

02:03   12   because the jury was scammed by bad-faith misconduct by TSI.

02:03   13   So it's not proper to say that, yes, we now know Swisher

02:03   14   acted in an anti-competitive fashion or that it injured TSI.

02:03   15   That was all premised on the fraud, the notion that the

02:03   16   products were lower cost and that they would have made all

02:03   17   these profits.  So to keep arguing that is really to

02:03   18   continue with the sort of bad-faith litigation that brought

02:03   19   us here.

02:03   20        The other point, Your Honor, I just want to make

02:03   21   briefly on the calculation and figure out where to date the

02:03   22   fees back to, we did say it should start from inception.  We

02:04   23   also said we could take out the contract damages.  It was

02:04   24   TSI that did not respond and say, you know, even if we are

02:04   25   wrong and there should be some sanctions, it should be

02:04   1   limited.  They were the ones that waived the argument that

02:04   2   it should be a lower amount.  And this Court does have

02:04   3   discretion to fashion an award that takes into account the

02:04   4   overall picture of the whole case.

02:04   5            As I said at the outset, the fundamental premise

02:04   6   of the case from Day 1 was based on this bad-faith theory,

02:04   7   that Swisher was going to put them out of business, and that

02:04   8   they were injured and competition was injured because they

02:04   9   didn't get enough of the cigarillos that they were going to

02:04  10   sell at a low cost.  We now know the only reason they were

02:04  11   low cost was because of the ongoing tax fraud scheme that

02:04  12   was going on right then when they filed the Complaint.

02:05  13            I guess I'll finish with this point because I find

02:05  14   it remarkable, the discovery point.  When I went back -- and

02:05  15   I wasn't at counsel table during the trial, but now we have

02:05  16   been together for a long time.  I've studied the record.  I

02:05  17   argued the case at the Ninth Circuit.  When I went back and

02:05  18   looked at the discovery responses and the notion that the

02:05  19   federal excess tax issues were irrelevant, would be

02:05  20   burdensome, Mr. Alrahib testified in his deposition that

02:05  21   he'd learned his lesson.  And then as the Court said quite

02:05  22   rightly -- said based on this I'm going to bar us from

02:05  23   examining him on these issues.  He knew that whole time that

02:05  24   he was right then engaged in this tax scheme.

02:05  25            THE COURT:  I guess the lesson he learned was how

02:05   1   to do it and then how to do it again.

02:05   2           MR. BOUTROUS:  Exactly.  He learned.  His own

02:05   3   testimony -- he said he learned the other guy was engaged in

02:05   4   a scheme, and he said I want to be a part of your scheme.

02:05   5   He confessed to that.  He knew that back when he was in this

02:06   6   court taking up this Court's time, taking up Swisher's time,

02:06   7   everyone spending all this time.  While he was sitting

02:06   8   there, he knew.  He didn't have to know the exact damage

02:06   9   calculation.  He confessed.  He said that they would not

02:06   10   have even been able to put products in the market.  They

02:06   11   wouldn't even have a business according to him if it wasn't

02:06   12   for his tax fraud scheme.

02:06   13           This is a compelling case, Your Honor.  It's

02:06   14   important for the judicial system -- I know the Court knows

02:06   15   that -- to not signal that parties can get away with this

02:06   16   and to compensate Swisher for being a victim of this bad

02:06   17   faith.  These sanctions are meant to protect the Court's

02:06   18   prerogatives and to make sure these things don't happen

02:06   19   again as to some other ongoing criminal who decides to

02:06   20   monetize their own crime.

02:06   21           Like Your Honor said, hey, it's working.  Now

02:06   22   let's try it in a civil case.  He had done it before.  He

02:06   23   was a recidivist having had the forfeiture earlier that he

02:07   24   claimed taught him his lesson.  You're right that it did

02:07   25   teach him a lesson, but he kept perfecting his fraud.  Then

02:07   1   he brought it into federal court here in California and

02:07   2   tried to use this court as a way to profit off of his tax

02:07   3   fraud.

02:07   4           For all those reasons, we request the Court enter

02:07   5   the tentative as modified as I suggested.  Thank you.

02:07   6           THE COURT:  Anyone want to be heard on either the

02:07   7   deferral motion or the setup motion?

02:07   8           MR. KLEINBRODT:  Your Honor, Julian Kleinbrodt

02:07   9   also on behalf of Swisher.

02:07   10          We are willing to submit on the tentative.  With

02:07   11  regards to those motions, we would respectfully request that

02:07   12  the Court consider a few minor revisions.  I'm happy to tick

02:07   13  through those now, but we can also as we have done in the

02:07   14  past submit a one-page or two-page table that simply notes

02:07   15  the very minor --

02:08   16          THE COURT:  Whatever you are most comfortable

02:08   17  with.

02:08   18          MR. KLEINBRODT:  Your Honor, I think we will just

02:08   19  out of respect for everybody's time submit a one-page filing

02:08   20  by tomorrow.

02:08   21          THE COURT:  Mr. Poe, could you respond, say,

02:08   22  within five days?

02:08   23          MR. POE:  Of course, Your Honor.  Yes.

02:08   24          MR. KLEINBRODT:  Thank you, Your Honor.

02:08   25          THE COURT:  Anything else today for Trendsettah?

| | | |
|---|---|---|
| 02:08 | 1 | **MR. POE:  So only to confirm -- Your Honor hasn't** |
| 02:08 | 2 | **changed it, so I assume that's the case -- two weeks from** |
| 02:08 | 3 | **the date that the order on the sanctions motion is heard?** |
| 02:08 | 4 | **THE COURT:  That's fine.** |
| 02:08 | 5 | **Thank you.** |
| 02:08 | 6 | **MR. BOUTROUS:  Thank you, Your Honor.** |
| 02:08 | 7 | **MR. POE:  Thank you, Your Honor.** |
| | 8 | (Whereupon, the proceedings were concluded.) |
| | 9 | *    *    * |
| | 10 | |
| | 11 | |
| | 12 | |
| | 13 | |
| | 14 | |
| | 15 | |
| | 16 | |
| | 17 | |
| | 18 | |
| | 19 | |
| | 20 | |
| | 21 | |
| | 22 | |
| | 23 | |
| | 24 | |
| | 25 | |

```
 1

 2

 3

 4                         CERTIFICATE

 5

 6          I hereby certify that pursuant to Section 753,

 7  Title 28, United States Code, the foregoing is a true and

 8  correct transcript of the stenographically reported

 9  proceedings held in the above-entitled matter and that the

10  transcript page format is in conformance with the

11  regulations of the Judicial Conference of the United States.

12

13  Date:  May 7, 2023

14

15

16                    /s/   Sharon A. Seffens  5/7/23
                      _____
17                    SHARON A. SEFFENS, U.S. COURT REPORTER

18

19

20

21

22

23

24

25
```