UNITED STATES DISTRICT COURT
CENTRAL DISTRICT OF CALIFORNIA

**CIVIL MINUTES - GENERAL**

| | | | |
|---|---|---|---|
| Case No. | 8:14-cv-01664-JVS-DFMx) | Date | November 17, 2023 |
| Title | Trendsettah USA Inc., et al. v. Swisher Int'l Inc. | | |

Present: The Honorable **James V. Selna, U.S. District Court Judge**

| | |
|---|---|
| Elsa Vargas | Not Present |
| Deputy Clerk | Court Reporter |
| Attorneys Present for Plaintiffs: | Attorneys Present for Defendants: |
| Not Present | Not Present |

**Proceedings:** **[REDACTED] [IN CHAMBERS] Order Regarding Motion for Prejudgment Interest [767], Motion to Vacate [768], and Motion for Attorney's Fees [773]**

Before the Court are three motions.

Plaintiffs Trendsettah USA, Inc. and Trend Settah, Inc. (collectively, "Trendsettah") move for prejudgment interest. (Mot. for Prejudgment Interest, Dkt. No. 767.) Defendant Swisher ("Swisher") opposes. (Opp'n Prejudgment Interest, Dkt. No. 778.) Trendsettah replied. (Reply Prejudgment Interest, Dkt. No. 788.)

Trendsettah moves to vacate the order awarding prevailing party attorney's fees and costs. (Mot. to Vacate, Dkt. No. 768.) Swisher opposes. (Opp'n Vacate, Dkt. No. 779.) Trendsettah replied. (Reply Vacate, Dkt. No. 789.)

Trendsettah moves for attorney's fees and expenses. (Mot. Fees, Dkt. No. 773 (redacted), 774 (unredacted).) Swisher opposes. (Opp'n Fees, Dkt. No. 782 (redacted), 781 (unredacted).) Trendsettah replied. (Reply Fees, Dkt. No. 787 (redacted), 793 (unredacted).)

For the following reasons, the Court **GRANTS in part and DENIES in part** the motion for prejudgment interest, **DENIES** the motion to vacate, and **GRANTS** the motion for attorney's fees. The Court awards Trendsettah **$10,237,493** in attorney's fees and **$613,181.32** in disbursements.

## I. BACKGROUND

The history of this case is extensive and well known to both of the parties. The Court provides merely a brief summary to frame the following discussion.

On October 14, 2014, Trendsettah, a cigarillo company, sued Swisher for violation of various federal and state competition laws and breach of the Private Label Agreements ("PLAs") between the two parties. (Compl., Dkt. No. 1.) On March 30, 2016, the jury found in favor of Trendsettah on both its contract and antitrust claims, awarding it $9,062,679 on its contract claims and $14,815,492 on its antitrust claims. (Dkt. Nos. 206, 207.) Following the jury trial, judgment was entered in favor of Trendsettah on April 14, 2016, with antitrust damages automatically trebled to $44,446,482.00 and post-judgment interest set to run on that date in accordance with 28 U.S.C. § 1961. (J., Dkt. No. 216.) The Court subsequently awarded Trendsettah attorney's fees and costs, as provided in the PLAs. (First Fees Order, Dkt. No. 342.)

On August 17, 2016, the Court granted Swisher judgment as a matter of law on its monopolization claim, denied judgment as a matter of law on attempted monopolization, granted Swisher a new trial on its attempted monopolization claim, granted a conditional new trial on the monopolization claim, and denied Swisher a new trial on the contract claims. (Dkt. No. 262.)

On September 9, 2016, the Ninth Circuit held in Aerotec International, Inc. v. Honeywell International, Inc. that "there is only a duty not to refrain from dealing where the only conceivable rational or purpose is to sacrifice short-term benefits in order to obtain higher profits in the long run from the exclusion of competition." 836 F.3d 1171, 1184 (9th Cir. 2016). In light of the Aerotec holding, Swisher filed a motion for reconsideration of the Court's denial of its motion for summary judgment on the antitrust claims, and the Court granted it on November 9, 2016. (Dkt. No. 274.) The Court entered judgment for Trendsettah on the breach of contract claims and judgment for Swisher on all other claims on December 14, 2016. (Dkt. No. 296.)

On February 8, 2019, the Ninth Circuit reversed the grant of summary judgment to Swisher on the antitrust claims and directed the Court to reinstate the jury verdict in its entirety on remand. Trendsettah USA, Inc. v. Swisher Int'l, Inc. (Trendsettah I), 761 Fed. App'x 714 (9th Cir. 2019). This holding restarted the Rule 60(b) clock with respect to the antitrust claims because the Ninth Circuit "substantially altered" the Court's

judgment. Trendsettah USA, Inc. v. Swisher Int'l, Inc. (Trendsettah II), 31 F.4th 1124, 1135 (9th Cir. 2022).

The trajectory of the case changed with the revelation on April 12, 2019, that Trendsettah's founder and then-CEO Akrum Alrahib was indicted for fraudulently evaded federal excise taxes to lower Trendsettah's costs, which thereby inflated its profits. Because the tax evasion was not known at the time of trial, it did not factor into the expert analysis of Trendsettah's profits.

On August 19, 2019, this Court granted Swisher's motion for Rule 60(b)(2) and (b)(3) relief from the entire judgment based on newly discovered evidence and fraud. (Rule 60 Order, Dkt. No. 426, at 18.) On January 21, 2020, the Court certified its August 19, 2019 order for interlocutory appeal "as it presents a controlling question of law, as to which there are substantial grounds for difference of opinion, and an immediate appeal from the order may materially advance the ultimate termination of the litigation." (Order Denying Reconsideration, Dkt. No. 483, at 12.) The Ninth Circuit subsequently denied several of Trendsettah's petitions, stating "[n]o further filings will be entertained in this closed case." (Dkt. No. 557-1.) The Court denied Trendsettah's motion for relief under Rule 60(b) on July 31, 2020. (Dkt. No. 561.) The Court then dismissed the entire action with prejudice under Rule 41(a)(2) in order to allow the Ninth Circuit to review the Court's Rule 60 rulings. (Dkt. No. 591). Accordingly, the Court entered a new judgment, finding in favor of Swisher on all claims. (Judgment ¶ 1, Dkt. No. 596.)

The Ninth Circuit agreed with the Court's Rule 60 Order in part. Trendsettah II, 31 F.4th at 1128. It "reverse[d] the district court's dismissal of [Trendsettah]'s breach of contract claims and remand with instructions to reinstate the jury's verdict on those claims. . . . [and] affirmed the district court's grant of Rule 60(b) relief as to [Trendsettah]'s antitrust claims." Id. Accordingly, the Court's order vacating judgment on Trendsettah's antitrust claims was upheld, but the jury's verdict in 2016 on the contract claim would be reinstated. See id. The Ninth Circuit indicated that the Court's subsequent dismissal of all claims effectively put an end to the antitrust claim. See id. at 1132 ("[H]owever we decide this appeal, the case will be over—either the jury's prior verdict will be reinstated or the district court's dismissal of Trendsettah's claims with

prejudice will stand."). Thus, while Trendsettah "prevailed" on its contract claim, it could no longer recover on its antitrust claims.

## II. Discussion

### *A. Motion for Prejudgment Interest*

We turn first to the calculation of interest on Trendsettah's contract damages. Equitable principles govern the motion at hand. To evaluate whether to exercise our discretion with regard to the prejudgment interest calculation, the Court confronts the wrongdoing that resulted in both the outcome of the litigation and its circuitous path to resolution.

#### 1. Legal Standard

State law sets the rate of prejudgment interest in diversity actions, and federal law sets the rate of post-judgment interest. Northrop Corp. v. Triad Int'l Mktg. Corp. S.A., 842 F.2d 1154, 1155 (9th Cir. 1988) (per curiam).

Under Florida law, "the general rule in contract cases is that the prevailing party receives prejudgment interest on its award." Blasland, Bouck & Lee, Inc. v. City of N. Miami, 283 F.3d 1286, 1297 (11th Cir. 2002). The state's "loss theory" considers prejudgment interest as an element of pecuniary damages, but courts may withhold it when "its exaction would be inequitable." Wiand v. Dancing $, LLC, 578 Fed. App'x 938, 947 (11th Cir. 2014) (quoting Wiand v. Lee, 753 F.3d 1194, 1204 (11th Cir. 2014)). The Eleventh Circuit lays out three equitable factors that guide a court's discretion in awarding prejudgment interest on a breach of contract claim under Florida law:

> (1) in matters concerning government entities, whether it would be equitable to put the burden of paying interest on the public in choosing between innocent victims; (2) whether it is equitable to allow an award of prejudgment interest when the delay between injury and judgment is the fault of the prevailing party; (3) whether it is equitable to award prejudgment interest to a party who could have, but failed to, mitigate its damages. Upon a consideration of these factors, a district court may decide not to award prejudgment interest or to reduce the amount of interest.

Lee, 753 F.3d at 1204 (citing Blasland, 283 F.3d at 1297–98).

Post-judgment interest on money judgments is governed by 28 U.S.C. § 1961, which provides that "[i]nterest shall be allowed on any money judgment in a civil case recovered in a district court. . . . Such interest shall be calculated from the date of the entry of the judgment, at a rate equal to the weekly average 1-year constant maturity Treasury yield" for the week immediately preceding the judgment. 28 U.S.C. § 1961(a). The purpose of § 1961, as recited by the Supreme Court, "is to compensate the successful plaintiff for being deprived of compensation for the loss from the time between the ascertainment of the damage and the payment by the defendant." Kaiser Aluminum & Chem. Corp. v. Bonjorno, 494 U.S. 827, 835–36 (1990) (quoting Poleto v. Consol. Rail Corp., 826 F.2d 1270, 1280 (3d Cir. 1985)).

2. Discussion

While the entry of judgment is the traditional dividing line between when prejudgment interest ends and post-judgment interest begins, it can be blurred by post-judgment litigation and a delay in the payment of a damages award. "The general rule is that when an appellate court reverses a judgement of the district court and directs that a money judgment in favor of a claimant be entered upon remand, prejudgment interest runs through the date of the newly-entered judgment." AT&T Co. v. United Comput. Sys., Inc., 98 F.3d 1206, 1211 (9th Cir. 1996) (citing Fed. R. App. P. 37).

This general rule, however, is subject to deviation according to three considerations: (1) at what point damages are sufficiently ascertained, (2) whether the pre- or post-judgment interest rate is higher, and (3) whether the prevailing or losing party is responsible for the delay. See AT&T, 98 F.3d at 1210–11 (distinguishing Northrop because damages had been properly ascertained in a first judgment and Kaiser Aluminum because the post-judgment interest rate was higher than the prejudgment interest rate); Barnard v. Theobald, 649 Fed. App'x 414, 416 (9th Cir. 2016) (inquiring both into when damages were sufficiently ascertained and whether to more fully compensate the prevailing party).

**a. Ascertainment of Damages**

Before a court can exercise its discretion in awarding pre- and post-judgment interest, the threshold inquiry asks whether there exists more than one judgment that sufficiently ascertains damages.

"Where the judgment on damages was not supported by the evidence, the damages have not been 'ascertained' in any meaningful way. It would be counterintuitive, to say the least, to believe that Congress intended post-judgment interest to be calculated from such a judgment." Kaiser Aluminum, 494 U.S. at 836. "[A]n exception to [the general] rule is made when a legally sufficient determination of damages had been made at the time of some prior judgment, which the judgment upon remand essentially reinstates." AT&T, 98 F.3d at 1209 (citing Northrop, 842 F.2d at 1156). In Kaiser Aluminum, the Supreme Court held that post-judgment interest be calculated from the later of two judgments because the first judgment's damages award was not supported by the evidence. Kaiser Aluminum, 494 U.S. at 835–36.

By the time this Court enters its forthcoming judgment in accordance with the Ninth Circuit's mandate, there will have been three judgments entered on Trendsettah's breach of contract claims: the original 2016 judgment, the reinstatement of the judgment following Swisher's appeal in 2019, and the upcoming reinstatement of the contract judgment. Each of the three ascertain damages of the same amount—the second two consisting of reinstatements of the original judgment. Thus, there are three judgments from which the Court may calculate pre- and post-judgment interest.

**b. Pre- and Post-Judgment Interest Calculation**

The next step in the inquiry evaluates the impact of the time and value of pre- and post-judgment interest on the prevailing party. While the parties agree that Florida law governs the prejudgment interest rate, the question of whether and when to grant prejudgment interest at all is a function of federal law. See 28 U.S.C. § 1961; Northrop, 842 F.2d at 1209 ("In diversity actions, state law determines the rate of prejudgment interest, and postjudgment interest is governed by federal law."). To fully ascertain the scope of the Court's discretion on the award of pre- or post-judgment interest here, we must look to the Ninth Circuit cases that set forth the controlling law.

"As between two judgments, both of which sufficiently ascertain the damages, equitable principles favor selecting the judgment which more fully compensates the

prevailing party." Planned Parenthood v. ACLA, 518 F.3d 1013, 1021 (9th Cir. 2008) (citing AT&T, 98 F.3d at 1211). More fully compensating the prevailing party is a function of whether the pre- or post-judgment interest rate is higher and which judgment is selected. In Northrop, the Ninth Circuit reinstated an arbitration award that was previously vacated by the trial court upon a motion by the losing party, effectively establishing two judgments that ascertained the same amount of damages. The post-judgment interest rate was higher than the prejudgment interest, and the prevailing party naturally sought to have the post-judgment interest rate run from the date of the earlier judgment. The court exercised its equitable discretion under § 1961 to run the post-judgment interest rate from the earlier judgment because it more fully compensated the prevailing party and the damages had been sufficiently ascertained at that point. In AT&T, the Ninth Circuit was confronted with a similar fact pattern, but equity counseled the opposite conclusion. The prejudgment interest rate was higher than the post-judgment interest rate. To follow Northrop's approach and run post-judgment interest from the earlier judgment, the court reasoned, would be to ignore the equitable purpose behind § 1961 and not more fully compensate the prevailing party. Thus, the court ran prejudgment interest to the later judgment date and post-judgment interest after.

The federal post-judgment interest rate is 5.41% for judgments entered between October 30 and November 5, 2023.[1] The Florida prejudgment interest rate as of October 1, 2023 is 8.54%.[2] Trendsettah argues that prejudgment interest should accrue through the date of the reinstatement of the jury verdict on its breach of contract claims. (Mot. for Prejudgment Interest at 2.) Citing the Ninth Circuit's holding in AT&T, Trendsettah maintains that interest should be allocated in the way most favorable to it as the "prevailing party" because it did not receive the contract damages at the time of the

---

[1] As published by the Federal Reserve. Selected Interest Rates (Daily) - H.15, Federal Reserve (Nov. 3, 2023) https://www.federalreserve.gov/releases/h15. The United States Bankruptcy Court, Southern District of California provides a helpful calculator. Post-Judgment Interest Rates, United States Bankruptcy Court, Southern District of California, https://www.casb.uscourts.gov/post-judgment-interest-rates (last visited Nov. 3, 2023).

[2] As published by Florida Department of Financial Services. Current Judgment Interest Rates, MyFloridaCFO, https://myfloridacfo.com/division/aa/local-governments/judgement-interest-rates (last visited Nov. 3, 2023).

original judgment in 2016, the Ninth Circuit's reinstatement of the jury verdict in 2019, or the Ninth Circuit's reinstatement of its breach of contract verdict in 2022. (Id. at 4.) Trendsettah asserts that there is "no basis to dispute the correctness of the jury's verdict" on any of its claims and that, unlike its convicted founder and CEO, its counsel and litigation funder have not committed any wrongdoing. (Id. at 5.) Although it argues that AT&T establishes a bright-line rule, Trendsettah urges the Court to balance the equities in its favor, "even if it were permissible under AT&T for a district court to just pick which party the 'equities' favor." (Id. at 4–5.)

Swisher argues that, under Florida law, the award of prejudgment interest is a matter of discretion for the court under equitable considerations and not subject to an absolute rule. (Opp'n Prejudgment Interest at 3.) Swisher contends that the equities do not support the award of prejudgment interest at all—regardless of when it runs—because Trendsettah's contract claims were based on lost profits calculations that turned out to be inaccurate due to Alrahib's fraud. (Id.) Even in light of the Court's acknowledgment that Trendsettah may have suffered some damages distinct from lost profits, Swisher argues, this is a fraction of the overall award. (Id.) In the alternative, Swisher argues that prejudgment interest should be calculated through the date of the Court's first judgment because damages had been sufficiently ascertained at that point. (Id. at 5.) Moreover, Swisher asserts that its delay in payment is due to Trendsettah's failure to disclose Alrahib's tax fraud and the necessary post-trial litigation that followed. (Id. at 7.)

Although the prejudgment interest rate is higher than the post-judgment interest rate and there exists more than one judgment at which damages were sufficiently ascertained, as in AT&T, these facts alone do not immediately end the inquiry with the same result. The running of pre- and post-judgment interest at which date of judgment cannot be completed without an examination of the equities.

### c. Prevailing Party's Delay

"Where a prior judgment awarding damages has been vacated pursuant to the actions of an ultimately losing party, equitable principles favor calculating the interest in a manner that more fully compensates the prevailing party. Any other result would penalize the prevailing party, and in certain circumstances might also encourage losing

parties to instigate postjudgment litigation so they can reap the benefits of a low interest rate." AT&T, 98 F.3d at 1211.

The equitable principles that favored an award of the higher interest rate from the initial judgment in AT&T do not apply here. The facts of this case reveal an important distinction with AT&T. In AT&T and the similarly situated case law, delays in final judgment were the result of the losing party's actions. Under those circumstances, the policy considerations behind AT&T ring true: the court should avoid "penaliz[ing] the prevailing party" and "encourag[ing] losing parties to instigate postjudgment litigation so they can reap the benefits of a low interest rate." But when a delay in final judgment is the result of the *prevailing party's own actions*, equitable considerations do not automatically counsel an interest calculation more favorable to that party. The second Lee factor—"when the delay between injury and judgment is the fault of the prevailing party"—contemplates precisely this situation as guiding the Court's discretion in reducing or withholding prejudgment interest.

To calculate prejudgment interest through the latest judgment in this case would not "more fully compensate[] the prevailing party" but overcompensate a party for a delay of its own making. Here, the losing party did not instigate post-judgment litigation to enjoy a lower interest rate—Swisher rightfully sought to adjudicate Trendsettah's fraudulent conduct that infected the jury verdict. It was only by a technicality that Swisher could not fully redress the harm as it relates to the breach of contract claims. Especially, as is the case here, when wrongful actions were revealed after an original judgment and necessitated further litigation, the prevailing party cannot be rewarded in equity with a higher interest rate calculation that runs the length of the delay it so caused.

That said, we cannot attribute the entirety of the delay from the original judgment to Trendsettah's actions. Between the Court's original judgment on April 14, 2016, and the Ninth Circuit's opinion filed on February 8, 2019, the litigation revolved largely around Swisher's appeal in light of the Ninth Circuit's Aerotec holding. This appeal was an action of the "losing party" with respect to the breach of contract claims, and to deny Trendsettah prejudgment interest through this period would, in fact, "penalize the prevailing party." The point at which Alrahib's fraudulent activity propelled further

litigation was the April 2019 revelation of his tax evasion. (Dkt. No. 377.) Thereafter, it was Trendsettah's wrongdoing that delayed final judgment in this case.

Equity does not counsel calculating prejudgment interest from the original judgment through the newly-entered judgment. Unlike the delay in AT&T, the delay in this case was occasioned on the fraud of the prevailing party and cannot be rewarded with a higher interest rate. To hold otherwise would upend the Ninth Circuit's rationale in AT&T. Accordingly, the Court exercises its discretion and sets prejudgment interest to run through February 8, 2019 and post-judgment interest to run thereafter.

*B. Motion to Vacate Attorney's Fees*

Pursuant to Federal Rule of Civil Procedure 60(b), the court may relieve a party from a final judgment, order, or proceeding because, among other reasons, "(5) "the judgment has been satisfied, released, or discharged; it is based on an earlier judgment that has been reversed or vacated; or applying it prospectively is no longer equitable." Fed. R. Civ. P. 60(b). The decision to grant relief is within the discretion of the court. Meadows v. Dominican Republic, 817 F.2d 517, 521 (9th Cir. 1987).

The parties do not dispute that a Rule 60(b)(5) motion is a proper vehicle for vacating of attorney's fees. The case law makes this clear. See Cal. Med. Ass'n v. Shalala, 207 F.3d 575, 577–78 (9th Cir. 2000) (agreeing with other circuits that a party may seek relief from attorney's fees under Rule 60(b)(5) without having appealed the fee award); Mother Goose Nursery Schs., Inc. v. Sendak, 770 F.2d 668, 676 (7th Cir. 1985) (holding that a timely appeal of a fee award is only necessary when a party challenges the substance of the fee but not upon the reversal of the underlying merits judgment). Where the parties disagree is the extent to which the Court has discretion to vacate the prior attorney's fees award and whether it should exercise that discretion.

Trendsettah cites California Medical Association as binding Ninth Circuit precedent for the proposition that a court abuses its discretion when it does not vacate the fee award that accompanied a now-reversed merits ruling. (Mot. to Vacate at 3 (citing Cal. Med. Ass'n, 207 F.3d at 579).) Swisher argues that the case's precedent is not so narrow, and it instead holds that the reason for a court's decline of relief must be sufficient when exercising its discretion to deny a motion to vacate a fee award. (Opp'n Vacate at 3–4.) The Court agrees.

In evaluating whether a district court abused its discretion in denying a motion to vacate the attorney's fees award connected with a merits judgment reversed on appeal, the Ninth Circuit put the propriety of the moving party's conduct at the center of the equitable consideration. In California Medical Association, the director of a state health agency was sued by healthcare providers seeking higher Medicare reimbursements. Cal. Med. Ass'n, 207 F.3d at 576. The district court ruled for the providers and awarded them attorney's fees. Id. The director appealed the decision and paid the fee award, but did not simultaneously appeal the fee award. Id. The director prevailed on appeal due to an intervening clarification in the Medicare statute, and the prior judgment was reversed. Id. After the providers refused to return the attorney's fees, the director moved under Rule 60(b)(5) for relief from the fee award, "reason[ing] that the award was no longer valid because it was based on a judgment that had been vacated." Id. The district court denied the motion on the equitable grounds that the purpose of the director's appeal was to delay litigation while the statute was clarified. Id. The Ninth Circuit reversed, holding that the district court abused its discretion because "fil[ing] an appeal in the hope of keeping an issue open while favorable legislation is under consideration" was "hardly improper." Id. at 578.

Here, bad faith abounds. Trendsettah's tax evasion was extraordinarily improper. This Court's sanctions order lays that bare. (Dkt. No. 775.) "Trendsettah improperly claimed it lost profits, when [in] reality, it knew that those 'lost profits' were directly generated from fraud." (Id. at 10.) Trendsettah knowingly brought its case on a lost profits damages theory after having fraudulently inflated its profits through tax evasion. (Dkt. No. 208, at 59, 67–68; Dkt. No. 379-1.)

The fact that Trendsettah's wrongdoing occurred outside of litigation is just as relevant here as it was to the sanctions motion: "Trendsettah's bad faith 'outside-litigation' conduct was grafted into its complaint from the start." (Dkt. No. 775 at 8.)

Trendsettah's contention that there is "no basis to dispute the correctness of the jury's verdict that [Swisher] breached its contract" fails to acknowledge the very actions that led us to the present dispute. Trendsettah's CEO perpetrated a scheme to avoid federal excise taxes in such a way that Trendsettah's financials were infected with inaccuracies. This fact does not absolve Swisher of liability for its own wrongdoing, to be sure, but the full extent to which liability and damages would be apportioned will

never be known. The jury was never presented with this evidence at trial when it originally issued its verdict for Trendsettah.

This Court does not strain to find the contract damages just as susceptible to interference from Alrahib's fraud as the antitrust claims. Trendsettah recovered on a lost profits theory. At trial, Trendsettah's expert Dr. DeForest McDuff testified to those profits, and the jury relied on this testimony in delivering its verdict. The verdict was thus based upon a profits calculation manipulated by the fraud of Trendsettah's CEO.

To be clear, the Ninth Circuit did not reinstate Trendsettah's jury verdict on the contract claims on the merits—the time had simply run out for the Circuit to even reach them. The fact that the Federal Rules of Civil Procedure provided an escape hatch from which Trendsettah could avoid scrutiny of its breach of contract verdict does not prevent this Court from reeling it back for a closer look in equity.

While vacating an award of attorney's fees in light of a reversal of a judgment on appeal may be the ordinary course, it is by no means the mandatory outcome of a court's discretion when the prevailing party's exceptional wrongdoing tips the scale of equities so far from its favor. What the Ninth Circuit in California Medical Association shows is that a court must provide a sufficient rationale for exercising its discretion in denying relief. The circumstances of this case provide overwhelming support for not vacating the fees award. Trendsettah's fraud in this case rises to a level of impropriety that tarnished the jury's ability to deliver justice, and as such, the Court exercises its discretion to not vacate the fees award.

As Swisher acknowledges in a footnote in its opposition, the Court's previous sanctions award overlaps to some extent with the categories in the award of attorney's fees and should be offset. (Opp'n Vacate at 2.) Accordingly, the Court reduces the award to Swisher by $2,388,065.95.

*C. Motion for Attorney's Fees*

1. Standard

The parties agree that Florida law governs Trendsettah's motion. (Dkt. No. 284, at 3; Dkt. No. 300, at 2.) Florida applies the federal lodestar approach to determine attorneys' fees. Fla. Patient's Comp. Fund v. Rowe, 472 So. 2d 1145, 1150 (Fla. 1985)

holding modified by Standard Guarantee Ins. Co. v. Quanstrom, 555 So. 2d 828 (Fla. 1990). Courts should consider the following factors:

> (1) The time and labor required, the novelty and difficulty of the question involved, and the skill requisite to perform the legal service properly.
>
> (2) The likelihood, if apparent to the client, that the acceptance of the particular employment will preclude other employment by the lawyer.
>
> (3) The fee customarily charged in the locality for similar legal services.
>
> (4) The amount involved and the results obtained.
>
> (5) The time limitations imposed by the client or by the circumstances.
>
> (6) The nature and length of the professional relationship with the client.
>
> (7) The experience, reputation, and ability of the lawyer or lawyers performing the services.
>
> (8) Whether the fee is fixed or contingent.

Id. Consistent with the federal lodestar approach, courts determine the number of hours reasonably expended on the litigation. Id. Courts then determine "a reasonable hourly rate for the services of the prevailing party's attorney." Id. The party seeking fees bears the "burden of establishing the prevailing 'market rate' i.e., the rate charged in that community by lawyers of reasonably comparable skill, experience and reputation, for similar services." Id. at 1151.

The PLAs contain the following provisions concerning attorney's fees and costs:

> In the event that either party shall bring any action upon any default in performance or observance of any covenant herein, the party judicially determined to be in such default shall indemnify the other against, or shall expeditiously reimburse such other party for, reasonable attorney's fees (including disbursements) incurred in pursuit of such judicial determination; provided, however, that if no party is judicially determined to be in default, the party bringing such action shall indemnify the other party against, or

> shall expeditiously reimburse such other party for, reasonable attorneys' fees (including disbursements) incurred in defense of such action.

(PLAs, Dkt. Nos. 25-1 § 16.3, 25-2 § 16.3.)

2. Analysis

**a. Discretion to Award Fees**

Trendsettah's neglect to address its wrongdoing is telling.

It would be inequitable to award attorney's fees to a party whose misconduct occasioned a multi-year delay for which the opposing party must now pay.

Swisher argues that Florida courts permit trial courts the equitable discretion to deny contractual attorney's fees upon a finding that there was no prevailing party under the "significant issues" test in breach of contract litigation. Trytek v. Gale Indus., Inc, 3. So. 3d 1194, 1203 n.12 (Fla. 2009). Trendsettah cites to Florida case law that overwhelmingly stand for the proposition that courts' discretion to deny contractual attorney's fees is significantly limited to instances where "no one won and no one lost." Merchants Bonding Co. v. City of Melbourne, 832 So. 2d 184, 185–87 (Fla. Dist. Ct. App. 2002); Skylink Jets, Inc. v. Klukan, 308 So. 3d 1048, 1054 (Fla. Dist. Ct. App. 2020); Trytek, 3 So. 3d at 1203.

The relevant provision of the PLAs reads, in part: "In the event that either party shall bring any action upon any default in performance or observance of any covenant herein, *the party judicially determined to be in such default* shall indemnify the other against, or shall expeditiously reimburse such other party for, reasonable attorneys' fees (including disbursements) incurred in pursuit of such judicial determination." (PLAs § 16.3 (emphasis added).) Whether or not the outcome was on the merits, the Ninth Circuit's ruling reinstating the jury verdict against Swisher for breach of contract is a judicial determination of "default in performance." Despite its conduct, Trendsettah is the prevailing party with respect to the breach of contract claims. The Court thus awards Trendsettah attorney's fees under the PLAs and proceeds to the fees calculation.

**b. Attorney's Fees Calculation**

As noted, under Florida law courts determine the appropriate amount of attorney's fees by using the lodestar method. "The number of hours reasonably expended, determined in the first step, multiplied by a reasonable hourly rate, determined in the second step, produces the lodestar." Rowe, 472 So. 2d at 1151. The Court turns to each of these steps in turn.

At various stages in this litigation, the Court has awarded attorney's fees to each of the parties. (Order Granting Trendsettah Fees, Dkt. No. 341; Order Granting Swisher Fees, Dkt. No. 621 (redacted), Dkt. No. 622 (unredacted).) As the Court held in those orders, attorney's fees awarded here must not include separate time dedicated "exclusively" to antitrust issues. The Court found that Florida law supports recovery for time litigating the amount of fees. (Order Granting Trendsettah Fees at 11.) The Court also found that the PLAs allow the recovery of disbursements. (Id. at 20.)

Trendsettah seeks to recover 8,754.1 hours for work done by Gaw|Poe and 1,657.7 hours by Goldstein & Russell ("G&R") for a total of $11,760,292 through April 18, 2023. (Mot. Fees at 2.) Trendsettah supplements its request with hours billed to recover "fees on fees" since April 18, 2023: 175.3 hours by Gaw|Poe for a total of $209,421.40 and 12 hours by G&R attorney Eric Citron for a total of $18,240. (Reply Fees at 20; Poe Decl., Ex. C; Citron Decl. ¶ 3, Dkt. No. 791.) Trendsettah also seeks to recover $614,452.14 in disbursements. (Reply Fees at 21.)

Trendsettah supports its request with a declaration from expert Gerald Knapton ("Knapton"). (Knapton Decl., Ex. 1, Dkt. No. 773-5 (redacted), Dkt. No. 774-1 (unredacted).) Trendsettah also seeks to recover "disbursements" under the PLAs less half of Dr. McDuff's expert fees to account for his damages work and not his antitrust work. (Mot. Fees at 4.)

Swisher objects to Trendsettah's request for fees and seeks an 80% reduction in the lodestar and costs, resulting in an award of no more than $1,513,059 in fees and $122,635 in costs. (Opp'n Fees at 5.) Swisher cites "Swisher's successes," Trendsettah's "misconduct," and Florida's fee cap as reasons for the reduction. (Id.)

### c. Number of Hours Reasonably Expended

Swisher disputes 1,285.55 of the requested hours for being non-compensable, as described below. (Id. at 7–8.) Swisher also seeks a 10% adjustment of the remaining hours to account for block-billing. (Id. at 8.) The Court will take up Swisher's contentions individually.

*i. Antitrust Work*

Swisher argues that Trendsettah has not eliminated hours exclusively related to antitrust work. (Opp'n Fees at 8.) In particular, Swisher points to work done relating to the first Ninth Circuit appeal on antitrust claims and entries specifying "refusal to deal" as work on the antitrust issue. (Id.) Swisher urges the Court to remove 562.7 hours, or $739,662, from the attorney's fees calculation. (Id. at 9.)

Trendsettah acknowledges that eight hours of Gaw|Poe tasks are properly excluded. (Reply Fees at 5.) Trendsettah contends that the 554.7 hours of G&R concern the first appeal, which so intertwine the contract and antitrust issues that the time spent exclusively on antitrust claims cannot be parsed out. (Id. at 6.) As for G&R's 41.2 hours that reference "refusal to deal," Trendsettah argues that this time spent on the first appeal was still intertwined with the contract claims. (Id.)

Other than the entries that explicitly reference "refusal to deal," Swisher does not provide enough support for the separation of the contract and antitrust issues in most of the flagged 562.7 hours for the Court to realistically exclude them. Although the Court recognizes the antitrust issues took center stage on the first appeal, they are too intertwined with the contract issues to reject wholesale. Swisher itself acknowledges that the contract claims hung in the balance: "Swisher's cross-appeal was fundamentally about [Trendsettah's] antitrust claims, as Swisher sought a new trial on [Trendsettah's] contract claims because the jury was improperly influenced by, and awarded damages based upon, evidence concerning the antitrust claims." (Opp'n Fees at 9.) Given the intertwining of the contract and antitrust issues, it is a monumental task to identify work that should be excluded as exclusively related to antitrust without more. Thus, the Court excludes eight Gaw|Poe hours (for Poe) and 41.2 G&R hours (31 for Citron, 4.6 for Davis, 1.4 for Goldstein, and 4.2 for Evans) that reference the "refusal to deal" issue as excludable antitrust work.

*ii. Wasteful or Unnecessary Work*

UNITED STATES DISTRICT COURT
CENTRAL DISTRICT OF CALIFORNIA

**CIVIL MINUTES - GENERAL**

| | | | |
|---|---|---|---|
| Case No. | 8:14-cv-01664-JVS-DFM | Date | November 17, 2023 |
| Title | Trendsettah USA Inc., et al. v. Swisher Int'l Inc. | | |

Swisher argues that 485.1 hours, or $603,832, be deducted from the lodestar because Trendsettah dedicated this time to unfiled or unnecessary motions during Swisher's pursuit of relief from the judgment based on Trendsettah's conduct across four categories: the May 2020 Mandamus Petition, Post-Rule 60 Discovery Disputes, Unfiled Rule 11 Motion, and Unnecessary or Excessive Hours.

**May 2020 Mandamus Petition.** Swisher argues that Trendsettah spent over 280 hours on an "exceptionally rare form of appellate relief" that was "clearly unmeritorious" and ultimately denied, especially in light of the Court's denial of reconsideration of its Rule 60 order and the Ninth Circuit's denial of interlocutory review. (Opp'n Fees at 10.) Trendsettah argues that although most mandamus petitions are denied, the petition was not "clearly unmeritorious" because it asked the Ninth Circuit to stay or deny the petition once it sought reconsideration, and the Ninth Circuit ruled that "[t]his petition for a writ of mandamus raises issues that warrant an answer." (Reply Fees at 7–8 (citing Dkt. No. 507).) Trendesttah contends that it sought reconsideration following the revelation that Swisher had "285 separate excise tax invoices from Havana 59." (Id. at 8.) Trendsettah also argues that the petition was not wasteful because it served as the "first draft of Trendsettah's opening appellate brief." (Id.)

This case's path to and from the Ninth Circuit is one rife with twists and turns, as this mandamus petition shows. Trendsettah's pursuit of the petition was interrupted by the motion for reconsideration, and there is no indication that the denial of the petition necessarily meant that it was wasteful. Thus, the Court does not exclude hours related to the mandamus petition.

**Post-Rule 60 Discovery Disputes.** Swisher argues that Trendsettah spent over 75 hours for "litigating a third-party subpoena and other discovery disputes prompted by its own resistance to this Court's discovery orders." (Opp'n Fees at 10.) Trendsettah argues that this time is appropriate because it was spent preparing for a second trial, did not concern antitrust issues, and related to a "good-faith disagreement" on the scope of discovery. (Reply Fees at 8.)

At first glance, Trendsettah's resistance to discovery in light of its own infection of the evidence seems to favor of finding the disputed time on these disputes as wasteful and unnecessary. As Judge McCormick noted, in light of Trendsettah's "misleading

financial records" which were relied upon by the damages expert and jury, "obtaining an accurate picture of [Trendsettah's] financial operations was the primary reason for reopening discovery." (Order to Compel at 3, Dkt. No. 560.) Trendsettah successfully opposed several of the requests for production, however, thereby casting doubt that the disputes were wasteful after all. It is not clear to the Court that these disputes warrant exclusion given that they represent, at least to some extent, valid concerns over the scope of discovery.

**Unfiled Rule 11 Motion.** Trendsettah acknowledges that it overlooked the challenged time spent on an unfiled Rule 11 motion and agrees that the 59.7 hours be excluded. (Reply Fees at 9.)

**Unnecessary or Excessive Hours.** Swisher argues that Trendsettah billed unnecessary or excessive hours in three instances: (1) over 33 hours billed by Victor Meng to "'[p]repare' for a meet and confer relating to Swisher's requests for production and 'research regarding same,'" (2) 29 hours billed by Meng to travel and depose Swisher's attorney, and (3) 1.5 hours for Tom Goldstein to "[f]orward Charles' research email to co-counsel and review." (Opp'n Fees at 11 (quoting Kleinbrodt Decl., Ex. A at 21–22, Ex. B at 10).) Regarding the 33 hours billed by Meng, Trendsettah contends that it cannot respond because Swisher's objection is not specific. (Reply Fees at 9.) Trendsettah argues that the 29 hours Meng billed were reasonable and allocated between 16.4 hours to travel between coasts and 12.6 hours to prepare for and take the deposition. Trendsettah argues that Goldstein was efficient in reviewing the research because the email is three pages and included three appellate opinions and a treatise excerpt. (Id.)

The Court agrees with Trendsettah that the hours disputed here are reasonable. It is reasonable, for instance, to spend eight hours traveling coast-to-coast each way, and although all depositions are different, spending 12.6 hours to prepare for a take a deposition does not strike the Court as excessive by any means.

*iii. Sanctions Opposition Work*

Swisher objects to Trendsettah's request of 149.9 hours, totaling $175,438, for its unsuccessful litigation over sanctions. (Opp'n Fees at 11.) Swisher argues that attorney's fees for opposing the sanctions motion defeats the purpose of the sanctions and exceeds the scope of the PLAs. (Id. at 11–12.) Trendsettah defends this time as

protecting against motions that would wipe out its contract damages award. (Reply Fees at 10.)

To award Trendsettah attorney's fees for opposing the sanctions motion that it ultimately lost would, in Swisher's terms, "defeat the compensatory and corrective purposes" of the sanctions. They are also far beyond what is called for in the PLAs, which concern fees relating to the breach of contract. Trendsettah's argument that its sanctions defense amounts to protecting its award conflates the two awards—the sanctions motion does not alter the Ninth Circuit's reinstatement of the jury verdict. The two are distinct, and the Court excludes hours dedicated to litigating the sanctions motion.

*iv. Intervention Work*

Trendsettah stipulates that the 19.7 hours Swisher objects to regarding Law Finance Group's intervention efforts should be excluded. (Id.)

*v. Excessive Attendance*

Swisher objects to 49.4 hours for traveling to and attending appellate arguments, with 33.1 hours for four attorneys to attend the first appellate argument in Pasadena and 16.3 hours for three attorneys to attend the second appellate argument in Orange County. (Opp'n Fees at 12.) Swisher asks the Court to apply a similar reduction to the 50% that the Court applied in its order regarding Swisher's attorney's fees for excessive attendance, especially where none of the attorneys argued the case or the argument was conducted remotely. (Id. at 12–13.) Trendsettah supports the attendance of three attorneys at the second appellate argument by pointing to the Court's previous holding that the attendance of three attorneys at a district court hearing is appropriate. (Reply Fees at 10.) Trendsettah argues that four attorneys were required to form a three-judge panel to "moot" arguments in preparation for the first appellate argument. (Id. at 10–11.)

While the Court did apply a 50% reduction in fees for excessive attendance with respect to Swisher's fees order, that reduction related to the attendance of four or five attorneys and comparatively lower-stakes status conferences. (Swisher Fees Order at 10.) The Court agrees with Trendsettah that the hours for three attorneys at a hearing and four to prepare for an appellate argument are reasonable.

UNITED STATES DISTRICT COURT
CENTRAL DISTRICT OF CALIFORNIA

**CIVIL MINUTES - GENERAL**

| | | | |
|---|---|---|---|
| Case No. | 8:14-cv-01664-JVS-DFM | Date | November 17, 2023 |
| Title | Trendsettah USA Inc., et al. v. Swisher Int'l Inc. | | |

*vi. Clerical Work*

Swisher argues that 18.8 hours of clerical work should not be compensable, particularly 15.5 to "revise" and "audit" timesheets and 0.5 hours to review "travel logistics." (Opp'n Fees at 13.) Swisher points to block-billing as making it difficult to separate compensable work from clerical work, but 18.8 hours account for work that should not be billed by an attorney. (Id.) Trendsettah agrees with excluding the 0.5 hours for "travel logistics," but contends that none of the other work in this category is "clerical." (Reply Fees at 11.)

Swisher correctly identifies entries as excludable clerical work, but three of the five disputed G&R entries block-bill additional, compensable attorney work. These three entries include clerical work like "logistical work on moot court conference," "revise timesheet," and "reschedule moot court" alongside reasonable attorney work like "intensive review of briefing and key cases" and "revise declaration." There is no need for the entries, with often wide-ranging and unrelated tasks, to lack individualized time breakdowns the way the other two disputed entries do. The Court thus excludes Gaw|Poe's 0.5 hours and 6.2 hours of non-block-billed G&R clerical work, and the Court applies a 25% reduction to account for block-billing the three remaining disputed entries. Those entries, which total 12.1 hours, are reduced to 9.1 hours (7.4 hours by Citron and 1.7 hours by Evans).

*vii. Block Billed or Vague Entries*

Swisher argues for a 10% reduction to the hours not otherwise objected to because block-billing and vague entries prevent them from being "meaningfully analyzed." (Opp'n Fees at 13.) This would resemble the Court's prior order regarding fees. (Dkt. No. 621.) Trendsettah counters that the Court's order applied the 10% reduction where block-billing accounted for "approximately one third of the fees Swisher's counsel" recorded. (Reply Fees at 11.) Here, Trendsettah argues that the four block-billed entries out of 1,069 for Gaw|Poe that Swisher identified are negligible. (Id.) Trendsettah argues that out of the 111 entries by G&R identified by Swisher as block-billed, 22 are not block-billed because they account for 0.1 hours, represent one-second "and forward" tasks, "concern time that Trendsettah voluntarily excludes," or list just one task. (Id.) As such, Trendsettah contends that 89 of G&R's 632 entries are block-billed, which

amounts to 14%, and a reduction proportionate to 10% for 33% block-billing would be a 4% reduction here. (Id.)

In the Swisher fees order, the Court applied a percentage reduction to account for the block-billing of of Swisher's entries. (Swisher Fees Order at 8–9.) The Court reasoned that "block billing makes it more difficult to determine how much time was spent on particular activities." Welch v. Metro. Life Ins. Co., 480 F.3d 942, 948 (9th Cir. 2007). "[B]lock billing itself is symptomatic of excessive billing." United Fabrics Int'l, Inc. v. C&J Wear, Inc., 2009 WL 10655841, at *2 (C.D. Cal. Sept. 29, 2009). As such, the Ninth Circuit has "upheld as a 'reasoned exercise of discretion' a district court's decision to reduce block-billed hours by 30%." United States v. W. Radio Servs. Co., 671 Fed. App'x 460, 461 (9th Cir. 2016) (citing Lahiri v. Universal Music & Video Distrib. Corp., 606 F.3d 1216, 1222–23 (9th Cir. 2010)). The Court followed this approach and applied a 30% reduction to the 30% of Swisher's entries that were block-billed, which equated to a 10% overall reduction in the requested hours.

A 10% reduction across all of Trendsettah's hours as requested by Swisher here would not be appropriate given that G&R block-billed less than half the percentage of entries as Swisher's attorneys had in its fees request. Trendsettah correctly separates 22 G&R entries as not block-billed or already excluded. The resulting math indicates that 14% of G&R's entries (89 out of 632) are block-billed. The same rationale behind the Court's 30% reduction in block-billed entries exists here, but it applies to a smaller portion of the overall fees request. Applying a 30% reduction to 14%, the Court applies a 4% reduction across-the-board to G&R's fees.

**b. Hourly Rates**

Trendsettah bears the burden of establishing a reasonable hourly rate. Rowe, 472 So. 2d at 1151. To meet this burden, Trendsettah provides expert testimony from Knapton. In his testimony, Knapton first considers the 2022 Real Rate Report, but deviates from it for each firm according to the distinct characteristics of the firms. Knapton arrives at rates after discussing the qualifications of the attorneys, including their legal education, judicial clerkships, prior law firms, and other relevant litigation experience. (Knapton Decl. at 15–18.)

Swisher argues that Trendsettah's requested rates are inflated and should be reduced to the third quartile Los Angeles litigation rates in the 2022 Real Rate Report. (Opp'n Fees at 14.) Swisher asserts that the Real Rate Report, which the Court accepted as the basis for its first order on Trendsettah's fees, represents "the prevailing 'market rate'" under Rowe. (Id. at 15.)

The Court considers each firm's rates in turn.

*i. Gaw|Poe Rates*

Trendsettah seeks rates of $1,222 for Gaw|Poe partners Randolph Gaw ("Gaw") and Mark Poe ("Poe"). (Mot. Fees at 10.) Trendsettah seeks a rate of $1,000 for attorneys Victor Meng ("Meng"), Samuel Song ("Song"), and Flora Vigo ("Vigo"). (Id.) For Gaw|Poe's paralegal Rebecca Mance ("Mance"), Trendsettah seeks a rate of $315. (Id.)

Regarding rates for Gaw|Poe, Knapton looks to the 2022 Real Rate Report, which in Knapton's opinion reflects contemporaneous rates through June 2022. (Knapton Decl. at 19–20 (showing third quartile rates of $1,045 for partners and $855 for associates in Los Angeles).) Knapton opined that a 17% increase in the 2022 Real Rate Report third-quartile rates is reasonable in calculating Trendsettah's fees given that rates "exploded" in 2022. (Id. at 21). Knapton supports this opinion by comparison with Swisher's attorneys' fees in connection with the sanctions motion, highlighting an average 17% increase in fees charged by Gibson Dunn partners and senior associates from 2022 to 2023. (Id. at 22.) Knapton also points to the 102-month delay in payment (87 months since the jury verdict), complexity of the litigation, quality of the attorneys' work, comparatively low number of hours worked versus Swisher's, and payment on contingency fee basis. (Id.) Knapton suggests the resulting rates, such as $1,222 for Gaw and Poe and $1,000 for junior attorneys, are a reasonable 20% increase over fees found reasonable for these lawyers in a case three years ago—especially in light of [redacted] over that same period. (Id. at 22–23.) In another comparison to Gibson Dunn, Knapton contrasts the adjusted $1,222 rate for Gaw|Poe named partners as "far below" the average 2023 rate of [redacted] for Gibson Dunn partners and on par with the [redacted] senior associate rate at the firm. (Id. at 23.)

Swisher rejects Knapton's comparison to Gibson Dunn's rates as unsupportive of the 17% increase and previously rejected by this Court. (Opp'n Fees at 14.) Swisher also argues that Knapton's comparison to rates awarded to Gaw|Poe by another court is not comparable because it involved a "putative class action involving a common fund" whereas this is a "non-class case in which [Trendsettah] prevailed only on breach-of-contract claims." (Id.) Moreover, Swisher contends that the 2022 Real Rate Report is appropriate because the Ninth Circuit reinstated the breach of contract verdict in 2022. (Id.)

The Court has previously resisted comparisons between Trendsettah and Swisher's attorneys' rates, noting the differences between the firms. (Trendsettah Fees Order at 15.) Trendsettah proceeds to make that very comparison when it co-opts Gibson Dunn's 17% rate increase and applies it to the 2022 Real Rate Report to calculate Gaw|Poe's rates. In the previous fees order, the Court applied the 2015 Real Rate Report third quartile rate in late February 2017. (Id. at 16.) The 2015 Report was the most up-to-date reflection of the prevailing rates available at the time, and the Court found it a sufficient north star for setting reasonable rates. This time around, less time has passed since the publication of the 2022 Real Rate Report and the consideration of this motion. It is the most current information available to the Court. Aside from proclamations about how rates have risen dramatically over the past year, Knapton's only other support for the 2022 to 2023 percentage increase is thin: he cites a single news article that presents conjecture from anonymous and geographically ambiguous "law firm leaders" about possible rate increases of 7–8% before discounting in 2023. (Knapton Decl. at 21–22.) Without a more robust showing that a rate increase is warranted, the Court finds the 2022 Real Rate Report third quartile Los Angeles rate for general litigation to be a reasonable basis for Gaw|Poe's rates. Accordingly, the rate is $1,045 for Gaw and Poe; the rate is $855 for Meng, Song, and Vigo.

*ii. G&R Rates*

Trendsettah seeks the following rates for G&R attorneys: $2,180 for Thomas Goldstein ("Goldstein"); $1,520 for Kevin Russell ("Russell") and Eric Citron ("Citron"); $1,080 for Daniel Woofter ("Woofter") and Charles Davis ("Davis"); and $385 for Erica Evans ("Evans"). (Mot. Fees at 11.)

In assessing rates for G&R, Knapton deems the Real Rate Report, which does not report data beyond the "third quartile" of attorneys, as insufficient to capture reasonable rates for attorneys "of comparable skill, experience, and reputation." (Knapton Decl. at 23–24 (internal citations omitted).) Knapton describes G&R as "one of only a few truly elite appellate boutiques in the country" as reflected by its lawyers résumés and experience. (Id. at 24.) Knapton also notes that unlike Gaw|Poe's contingency fee practice, G&R's hourly billing makes up a greater proportion of its work, which lends support for the notion that its hourly rates are reasonable because its clients regularly pay them. (Id.) Knapton also draws a comparison with Gibson Dunn's rates, which reflect Theodore Boutrous's rate as "slightly less" than Goldstein's but "seven out of eight other Gibson Dunn partners billing at higher rates" than Russell and Citron as well as associates billing at higher rates than Woofter and Davis. (Id.)

Swisher objects to G&R's proposed rates and Knapton's arguments in support of them. (Opp'n Fees at 16.) Swisher rejects Knapton's comparison to Swisher's attorneys because, unlike G&R, Gibson Dunn is a much larger firm that can delegate work to less-expensive attorneys. (Id.) Swisher also contends that Knapton compared the firms' current rates when discussing Swisher's fee award, although its award was based on historic rates. (Id.)

Unlike Gaw|Poe, which the Court assessed in a prior fees order, G&R presents a new and distinct rate question. While comparisons between Gibson Dunn are unavailing with respect to Gaw|Poe, they are more apt when turned to G&R. Notwithstanding their stark differences in size, the firms boast attorneys with the highest levels of legal training and experience. For this reason, the 2022 Real Rate Report average rates are not helpful. Instead, because both firms predominantly charge clients by the hour, rather than on a contingency basis, we have actual rates with which to assess reasonableness in the context of this case. The Court relied on Gibson Dunn's provided rates in Swisher's fees order, and while those rates went unopposed, Swisher objects to G&R's rates here. Swisher offers no alternative to the 2022 Real Rate Report rates, and as Trendsettah notes, attorneys of similar experience levels at both firms worked similar hours (undercutting Swisher's argument that Gibson Dunn's ability to pass off work to less expensive attorneys). (Reply Fees at 14–15.) G&R's fees appear reasonable when compared side-by-side with Gibson Dunn's—they are lower than Gibson Dunn's in all

instances except Goldstein's. Even Goldstein's relatively high rate is justifiable given his appellate experience, including extensive Supreme Court argument. It was this experience that prompted Trendsettah to hire the firm for its appeals. Accordingly, the Court accepts G&R's rates as reasonable.

*iii. Additional Arguments for Reduction*

Swisher makes two additional arguments for the reduction in Trendsettah's lodestar based on Florida law. (Id.) First, Swisher urges the Court to reduce the lodestar by 80% to reflect the "results obtained," which includes "a breach-of-contract award that was less than one-third [Trendsettah's] request to the jury" and $3.94 million in sanctions. (Id. at 16–17.) While "results obtained" is a factor under Rowe, it is not such a substantial consideration that it warrants a dramatic reduction like the one proposed by Swisher. Moreover, to the extent that Swisher bases its argument on the fact that the previous Trendsettah fees order found "significant limitations" in the trial result, this argument fails when revealing the context of that finding. After weighing the Rowe factors, the Court determined that neither a reduction nor a multiplier was warranted, as the "significant limitations" were offset by other factors like Gaw|Poe's contingent basis and financial risk that weighed in favor of an increase. (Trendsettah Fees Order at 19.) These same factors apply today and do not warrant a reduction.

Second, under Florida's cap on "all court-awarded fees at the prevailing party's fee arrangement with counsel," Swisher argues that a lodestar reduction is required. (Id. at 18.) The problem that Swisher raises in its opposition is that the fee agreements Trendsettah provided in 2019 are not current. (Id. at 18.) Trendsettah acknowledges that the Gaw|Poe agreement is "stale" and provided the Court with updated terms and calculations. (Reply Fees at 18.) The following represents the original Gaw|Poe and Trendsettah fee agreement:

> For Gaw | Poe's part, their fee is [redacted]

UNITED STATES DISTRICT COURT
CENTRAL DISTRICT OF CALIFORNIA

**CIVIL MINUTES - GENERAL**

Case No. 8:14-cv-01664-JVS-DFM Date November 17, 2023

Title Trendsettah USA Inc., et al. v. Swisher Int'l Inc.

(Opp'n Fees at 18 (quoting Gaw Decl. ¶¶ 6–7, Dkt. No. 383-1).) Trendsettah and Gaw|Poe updated their fee agreement on August 19, 2019, after the Court vacated the jury verdict, such that from August 26, 2019 forward, Gaw|Poe "would be entitled to [redacted] of any hourly fees that may eventually be awarded." (Reply Fees at 18.)

G&R's fee agreement, which is accurate in Swisher's opposition, is as follows:

> As for Goldstein & Russell's fee agreement, I have reviewed it and am familiar with its contents. Goldstein & Russell is entitled to [redacted] of the $44.4 million jury verdict for its role in reinstating that verdict, as well as [redacted] of any attorney's fees awarded for its work.

(Opp'n Fees at 18 (quoting Gaw Decl. ¶¶ 6–7, Dkt. No. 383-1).)

The Court does not run the risk of encountering Florida's fee cap given the reductions made and percentage fee agreements, as indicated in the lodestar calculations below.

*iv. Supplemental Hours*

Trendsettah submits with its Reply a supplemental request for hours spent preparing this motion. (Reply, Poe Decl., Dkt. No. 793-2 (unredacted).) Swisher did not brief this request.

**c. Lodestar Calculation**

Table 1: Gaw|Poe Total Number of Hours

| **Timekeeper** | **Req. Hours** | **Anti trust** | **Rule 11** | **Sanc.** | **Interv.** | **Cler.** | **Supp.** | **Total** |
|---|---|---|---|---|---|---|---|---|
| M. Poe | 4,189.3 | -8 | -9.3 | -107.3 | -13.4 | | 129 | 4,180.3 |
| R. Gaw | 1,197.3 | | -14.9 | -6.8 | -0.7 | -0.5 | 24.7 | 1,199.1 |
| V. Meng | 1,659.7 | | | | | | 10.9 | 1,670.6 |
| S. Song | 448.7 | | | | | | | 448.7 |

UNITED STATES DISTRICT COURT
CENTRAL DISTRICT OF CALIFORNIA

**CIVIL MINUTES - GENERAL**

Case No. 8:14-cv-01664-JVS-DFM Date November 17, 2023

Title Trendsettah USA Inc., et al. v. Swisher Int'l Inc.

| | | | | | | | | |
|---|---|---|---|---|---|---|---|---|
| F. Vigo | 174.9 | | -24.5 | -35.4 | | | 10.7 | 125.7 |
| Contract Attorneys | 1,079.2 | | | | | | | 1,079.2 |
| R. Mance | 5 | | | | | | | 5 |

To calculate Gaw|Poe's total number of hours, the Court started with Trendsettah's requested hours, then subtracted the excluded hours, and finally added the supplemental hours as indicated above.

Table 2: Gaw|Poe Total Fees

| **Timekeeper** | **Hours** | **Rate** | **Total** |
|---|---|---|---|
| M. Poe | 4,180.3 | $1,045 | $4,368,413.50 |
| R. Gaw | 1,199.1 | $1,045 | $1,253,059.50 |
| V. Meng | 1,670.6 | $855 | $1,428,363 |
| S. Song | 448.7 | $855 | $383,638.50 |
| F. Vigo | 125.7 | $855 | $107,473.50 |
| Contract Attorneys | 1,079.2 | $400 | $431,680 |
| R. Mance | 5 | $315 | $1,575 |

Table 3: G&R Total Number of Hours

| **Timekeeper** | **Req. Hours** | **Anti trust** | **Rule 11** | **Sanc.** | **Interv.** | **Cler.** | **Total After Excl.** | **Total Minus 4%** |
|---|---|---|---|---|---|---|---|---|
| T. Goldstein | 169.4 | -1.4 | | | | | 168 | 161.3 |
| K. Russell | 10 | | | | | | 10 | 9.6 |
| E. Citron | 1,185 | -31 | -11 | -0.4 | -5.6 | -13.6 | 1,123.4 | 1,078.5 |

| | | | | | | | | |
|---|---|---|---|---|---|---|---|---|
| D. Woofter | 15.8 | | | | | | 15.8 | 15.2 |
| C. Davis | 218.3 | -4.6 | | | | | 213.7 | 205.2 |
| E. Evans | 59.2 | -4.2 | | | | -1.7 | 53.3 | 51.2 |

To calculate G&R's total number of hours, the Court began with Trendsettah's requested hours, subtracted excluded time entries, and then applied a 4% reduction.

Table 4: G&R Total Fees

| **Timekeeper** | **Hours** | **Rate** | **Total** |
|---|---|---|---|
| T. Goldstein | 161.3 | $2,180 | $351,634 |
| K. Russell | 9.6 | $1,520 | $14,592 |
| E. Citron | 1,078.5 | $1,520 | $1,639,320 |
| D. Woofter | 15.2 | $1,080 | $16,416 |
| C. Davis | 205.2 | $1,080 | $221,616 |
| E. Evans | 51.2 | $385 | $19,712 |

Table 5: Complete Lodestar Calculation

| **Firm** | **Hours** | **Total** |
|---|---|---|
| Gaw\|Poe | 8,708.6 | $7,974,203 |
| G&R | 1,520.8 | $2,263,290 |
| **Totals** | **10,229.4** | **$10,237,493** |

2. Disbursements

Trendsettah seeks $613,181.32 in disbursements, minus half of Dr. McDuff's fees to account for excludable antitrust work. (Mot. Fees at 12.) The PLAs allow for such a

UNITED STATES DISTRICT COURT
CENTRAL DISTRICT OF CALIFORNIA

**CIVIL MINUTES - GENERAL**

| | | | |
|---|---|---|---|
| Case No. | 8:14-cv-01664-JVS-DFM | Date | November 17, 2023 |
| Title | Trendsettah USA Inc., et al. v. Swisher Int'l Inc. | | |

recovery. (Gaw Decl. Ex. 20 at 10, ¶ 16.3; Ex. 21 at 11, ¶ 16.3.) Swisher does not dispute the amount requested. Accordingly, the Court awards $613,181.32.

## IV. Conclusion

For the foregoing reasons, the Court **GRANTS in part and DENIES in part** the motion for prejudgment interest, **DENIES** the motion to vacate, and **GRANTS** the motion for attorney's fees. The Court awards Trendsettah **$10,237,493** in attorney's fees and **$613,181.32** in disbursements. Trendsettah shall submit a form of judgment within seven days.

**IT IS SO ORDERED.**